CITY OF TULSA, Oklahoma, a Municipal
Corporation, Plaintiff in Error,

v.

Hugh B. NICHOLAS and Nevola Nicholas,
Husband and Wife, F. L. Richards, and
Clinton McGill, Defendants in Error.

No. 41109.

Supreme Court of Oklahoma.

June 21, 1966.

Charles E. Norman, City Atty., Louis Levy, Asst. City Atty., Tulsa, for plaintiff in error.

McGee & Dowd, Richard K. McGee, W. Timothy Dowd, Tulsa, for defendants in error F. L. Richards and Clinton McGill.

William A. Harrington, Tulsa, for defendants in error Hugh B. and Nevola Nicholas.

BLACKBIRD, Justice:

This appeal involves the efforts of the defendants in error, who own real estate in the Sheridan Heights Addition of the City of Tulsa, to relieve said property from operation of one of said City's zoning ordinances restricting use of lots in said Addition, and its vicinity, to "U1C", or single family residential, use.

The property owned jointly by the defendants in error, Richards and McGill, consists of a single family brick veneer dwelling and lot on the northwest corner of Fourth Place and Sheridan Road, legally described as Lot 18 in Block Five of said Addition. The property, jointly owned by the defendant in error, Nicholas, and his wife, Nevola, consists of the same type of residence and lot on the northwest corner of Fourth Street and Sheridan Road, together with an adjoining vacant lot fronting on Fourth Street, whose legal description is Lots 16 and 17 of said Addition's Block One.

The plans of Richards and McGill for the use of their lot envision removal of the house thereon and the construction of an automobile filling, or service, station on said site. Such use is a permitted one as to lots having classification referred to in Tulsa's zoning ordinance as the "U3C", or "Special Service District", classification, Nicholas, a practicing physician, wants to move his medical office into the house on his and his wife's property, after altering the house so that it will face Sheridan Road, and to provide a place on the vacant lot, adjoining it, for his patients to park their automobiles.

The total area, in which such professional and commercial uses is forbidden by the zoning ordinance involved, extends several blocks, both east and west of Sheridan Road, in the area between Admiral Boulevard and Eleventh Street. It was encompassed in a plan of development evolved by the Tulsa Metropolitan Area Planning Commission in 1957, known as the "Sheridan Plan." It was to put this plan into effect that Tulsa's Board of City Commissioners thereafter enacted the zoning ordinance involved herein, upon the recommendation of said Planning Commission, hereinafter referred to by the initials "TMAPC." A narrow portion of the area nearest to Sheridan Road is depicted on the following plat, which, though

not strictly accurate in all respects, indicates the location of the two subject parcels of realty, in relation to some other physical characteristics of the area.

A portion of the present controversy began in August, 1959, when Dr. Nicholas and his wife filed an application with the TMAPC for a U3B zoning classification for the property, to enable its use in the manner already indicated. After a public hearing before the TMAPC, at which applicants submitted, in support of their application, a petition signed by 67 owners of lots within 1,000 feet of the Nicholas property, the TMAPC refused to make the requested zoning change. Nicholas and his wife then appealed the TMACP's ruling to the Board of City Commissioners and, after a hearing on said appeal, the Board, in December, 1959, affirmed the TMAPC's decision. Thereafter, in June, 1962, Nicholas and his wife, as plaintiffs, filed a district court action against the City, its Building Inspector, and the Members of its Board of City Commissioners, as defendants, praying for an injunction to prevent said defendants from continuing to enforce the hereinbefore described zoning ordinance (sometimes referred to as the "Sheridan Plan Ordinance") against their premises, in such a manner as to prevent its use as a professional office.

The portion of the present controversy involving the hereinbefore described property of Richards and McGill began when the TMAPC denied those owners' application for a change in their lots' zoning from the U1C to the U3C classification. After a public hearing in January, 1960, on these applicants' appeal, from the TMAPC decision, to the Board of City Commissioners, said Board also denied their application. They then filed a district court action against the City and members of its Board of City Commissioners praying the court to annul the previous action of the two named municipal bodies, and grant them the rezoning sought.

Thereafter, the two above described district court actions were consolidated for trial, at the close of which, judgment was entered for the defendant city and city officials, as to both of the subject properties. Thereafter, however, the trial court sustained the property owners' motion for a new trial, and said ruling was affirmed on appeal to this Court in City of Tulsa v. Nicholas, Okl., 385 P.2d 816. The present appeal arises out of the new trial ordered in the cited case.

At this second trial, the applicants, otherwise referred to as "plaintiffs", as well as the City and its defending officials, introduced evidence in addition to that in the record of the first trial. At the close of this evidence, the cause was continued until the trial judge, at the request of both sides, could personally view the involved area, both during daylight and at night. Thereafter, upon consideration of the evidence introduced at the first trial, and incorporated in the casemade compiled for the previous appeal in City of Tulsa v. Nicholas, supra, together with the evidence introduced at the second trial, and his own personal observations, the court entered judgment for plaintiff, in accord with views he orally announced from the bench, and incorporated into the record as "findings." Among these findings the court stated, among other things:

"* * * I feel that in viewing the premises and observing the various reasons set forth in the casemade as to why this property should be rezoned as against the reason it should not be, that the City of Tulsa, in refusing the rezoning, did act in an arbitrary and capricious manner and that it was an undue interference with the rights of the parties in the use and enjoyment of the property."

After the overruling of its motion for a new trial, the defendant City brought the present appeal to this Court.

All of defendant's arguments for reversal are advanced under the following Proposition:

"The trial Court erred in rendering judgment for applicants, and adjudging

that the City abused its discretion, acted arbitrarily—in view of the overwhelming abundance of evidence showing the City Commission of the City of Tulsa not to have acted in an arbitrary, unreasonable or capricious manner."

The inference threading its way throughout defendant's arguments is that there was an abundance of evidence in this case showing that the public welfare is served, or promoted, by its Board of City Commissioners' rejection of plaintiffs' applications for the rezoning of their respective properties—thus, whether said Board's decision was an unreasonable, or arbitrary, exercise of its power or discretion, was (at least) "fairly debatable", and therefore the trial court erred in substituting its judgment for that of the City's said legislative body.

█ Plaintiffs apparently agree, and the trial court specifically recognized, that said Court could not overturn the Board's decision unless it found it arbitrary, unreasonable, or capricious; but plaintiffs invite our attention to City of Tulsa v. Swanson, Okl., 366 P.2d 629. This Court's opinion in that case proceeded upon the premise that there inhered in the trial court's judgment there, the finding that the reasonableness of the ordinance involved, as applied to the property there involved, was not a "fairly debatable" question. There we applied the appellate review rule applicable to cases of equitable cognizance generally, and affirmed the trial court's judgment upon determining that it could not be held to be " * * * against the clear weight of the evidence."

█ We think the same finding as to the debatability of the reasonableness of keeping plaintiffs' property under the Sheridan Plan Ordinance's U1C zone, or classification, and denying their applications for rezoning, inheres in the judgment involved here; and we will use the same test in our appraisal of it, as was applied in the cited case.

According to the undisputed evidence in this case, Sheridan Road, hereinafter referred to merely as "Sheridan", is a 100-foot wide, 4-lane, heavily traveled thoroughfare. It is traversed by an average of 16,000 vehicles per day, including various types of heavy trucks, and is the principal route of travel between a shopping area, or center, called "Sheridan Village", a motel, and a German Lutheran Church on its north end, above Second Street, and the business and industrial establishments to the north of Admiral Place and Admiral Boulevard, such as Spartan's plant, a distance of a third of a mile, or more, north of businesses on 11th Street and industrial areas to the south of it, such as the Robert Seigfried and Frisco industrial centers. This intersecting Eleventh Street is also a heavily traveled arterial thoroughfare. Many employees of the American Air Lines and the Douglas Aircraft Plant, which are in a northerly direction from the subject area, use Sheridan in going to and from their work. On this Street's segment depicted in the foregoing plat, there are electric traffic control lights at its intersections with 11th Street, Admiral Place, and Fourth Place, which latter is also a 4-lane, heavily traveled street, but is only 44 feet in width. North of Second Street, on Sheridan, there is a large drive-in restaurant, as well as a Texaco Filling Station. There are other stations of that character on Sheridan, between Fifth Place and Seventh Street, and at Sheridan's intersections with 7th and 11th Streets. Between Seventh and Ninth Streets, there is an apartment building on Sheridan's west side. North of Third Street, along Sheridan's west side, is a combined elementary and junior high school, with adjacent play grounds, including an outdoor basket ball court. The lots north of Fourth Street, along the east side of Sheridan, are occupied by the Sheridan Avenue Christian Church; and, between the time Dr. and Mrs. Nicholas purchased their lots, and the date Tulsa's Board of Commissioners denied their hereinbefore mentioned application, three structures were removed from more than half of the block, bordered by Fourth Street and Sheridan, to make

room for construction of a large youth center, and/or auditorium, erected there by said Christian Church.

Mr. Don Harrington, a realtor and builder, who owns a lot on the corner of Fifth Place and Sheridan, constructed a building on it in 1950, and it now houses his real estate office. He also owns the residential property adjoining it on the east. He testified, among other things, that he plans to build a Sixty-Thousand-Dollar professional office building on it if he can get it rezoned like his corner property. He also testified as to the existence of the "Oil Capitol Building" between Sixth and Seventh Streets (apparently on Sheridan) and identified a picture showing another lot in that block, with a small frame house on it, being advertised, by a large sign in the yard, as: "Zoned Business Property." He also testified that property on Seventh Street is being used for its business by the Self Plumbing Supply Company.

Dr. Nicholas and Mr. Harrington testified about a property across the street from the Richards-McGill property that has been used for an automobile repair shop. Mr. Harrington also testified about another property in the same vicinity that served as a shrubbery nursery's place of business, and a residence, between his office and the Richards-McGill property, that has a "big fence" all around it, and a sign on it, and is used as a day nursery.

Besides the applicants themselves—and their witness, realtor Don Harrington— Irving Wolff, owner of a dwelling in the area, Ralph M. Darnell, another realtor, who had formerly been on Tulsa's Planning Commission about 25 years, and Phil Hendricks, Vice-President of an investment company, all testified for plaintiffs. Significant features of their testimony, were in substance that the lots along the west side of Sheridan, between Third and Fifth Streets, comprise what was characterized as a small "island" of residences between larger areas, both north and south of it, that are devoted to commercial and industrial use; that because of this situation, Sheridan is burdened with so much heavy traffic that it will never be desirable as a residential district, and it is "inevitable" that this small island will become commercial also; that the sooner this small "residential" area can be converted to commercial use, the better it will be for property values in it. The tenor of some of this testimony was that loan companies, and investors, will not now lend money for construction of residences in the area, that those properties now being used as residences there are becoming "run down" and are in a poor, and undesirable, state of repair, that their rentals are decreasing, that it is difficult for residents in the area to back autos out of their driveways into Sheridan traffic, that no residences have been constructed on lots in the area that front on Sheridan for at least a year and a half, that these conditions are not going to improve as long as Sheridan continues to be a heavily traveled thoroughfare, with large cattle trucks and industrial vehicles using it, and that there appears to be no end to this condition in the foreseeable future. These witnesses expressed opinions to the effect that plaintiffs' lots could be rezoned without detriment to the value of other residential properties in the U1C area, east and west of those bordering on Sheridan, and fronting on the "side", or intersecting, streets.

It was shown at the first trial (as reflected in our opinion in City of Tulsa v. Nicholas) that, when plaintiffs' applications were before the City Commissioners, no person living in the area indicated any objection, or filed a protest, to their being granted; and the witness, Darnell, testified that if the "property owners along Sheridan don't want the protection" of U1C zoning, it should not be forced upon them. It was also indicated that, when the TMAPC was making its study of the area, preliminary to recommending the Sheridan Plan to the Board of City Commissioners, the poll they took, indicating the Plan's endorsement by persons residing in the area, was not restricted to owners of property there, but was taken from "occupants."

At the first trial, defendant produced only two witnesses to testify in their behalf. One was the director of TMAPC, the same witness referred to in City of Tulsa v. Swanson, supra, as an "urbanist", or "professional city planner." The other witness was the owner of a firm of consulting city planners. These expert witnesses disagreed with some of the opinions expressed by plaintiffs, and their witnesses, and referred to the "piece meal" rezoning of Sheridan, as "strip zoning." It was their view that such zoning was detrimental, not only to real estate values in the area, but to the welfare of the public and persons living in, and coming into and out of, the area. Neither of these witnesses claimed to have ever had any experience in the real estate, or real estate appraisal, business, and their testimony was interlaced with technical theories and equivocal conclusions. Though they expressed opinions to the effect that the commercialization of the area could be stopped, if no more property in the area were rezoned, and its value, for residential purposes, would make a "come back" if no more "strip zoning" occurred and U1C zoning in the area were "stabilized", neither offered any solution to the heavy traffic problem on Sheridan, nor made a successful effort to refute plaintiffs' witnesses' opinions that, as long as this problem exists, commercialization of the area is inevitable. Defendant's witnesses cited the example of South Peoria Street, which is traveled by 19,000 vehicles per day, but, by Mr. Dunaway, an American Airlines Inspector—and the only home owner residing in the subject area to testify on the side of the defendant—it was revealed that the average lot there has a frontage of only 65 feet and a depth of only 130 feet, deducting 5 feet for the utility easement. Plaintiffs' witnesses demonstrated that the situation existing on Sheridan is not analogous to that on South Peoria, by their testimony concerning the differences between the size and type of homes in the two areas.

This court has previously given approval to the judicial relaxation of restrictions on property, originally residential, where conditions have changed, and such restrictions, as a practical matter, have failed to preserve an area's comparative value for residential use. In many of its physical characteristics, the subject segment of Sheridan is very similar to the portion of Oklahoma City's Twenty-Third Street involved in Wood v. Knox, Okl., 277 P.2d 982. And the facts of this case as well as the circumstances under which it was tried, bear a substantial similarity to those in City of Tulsa v. Swanson, supra. In the last cited case, we recognized that the exercise of a municipality's police power, in restricting private property rights, can be justified only where the facts and circumstances show the necessity for it; and we demonstrated that academic opinions of professional city planners, as to the desirability of a particular zoning restriction, will not necessarily preclude judicial interference with the municipal authorities' determination of such restriction's need, on the ground that the question involved was thereby rendered "fairly debatable". There, we pointed out that whether or not the matter is "fairly debatable", depends upon "the physical facts disclosed in each particular case."

On the basis of the physical facts established by the evidence in this case, many of which were specifically referred to in the trial court's findings, we can neither hold that the question of justification for defendant's refusal (through its Board of City Commissioners) to grant plaintiffs' applications was a "fairly debatable" one, nor that the trial court's essential findings and judgment were against the clear weight of the evidence. Said judgment is accordingly affirmed.

JACKSON, V. C. J., and DAVISON, WILLIAMS, IRWIN, BERRY, HODGES and LAVENDER, JJ., concur.

HALLEY, C. J., dissents.

HALLEY, Chief Justice (dissenting).

I am forced to dissent in this case for the reason that I think that the rezoning of the area under consideration is unwarranted here. It will make commercial an area that is residential, and force property owners to put up with conditions that make living therein unbearable.